# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| MARY TURNEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:13-CV-3-TLS |
| | ) | |
| GENERAL MOTORS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

The Plaintiff, Mary Turney, claims that her employer, General Motors, LLC, has discriminated against her on the basis of her gender in violation of Title VII and the Equal Pay Act. She maintains that the Defendant then retaliated against her after she filed an EEOC Charge complaining of the discriminatory pay. The Defendant has moved for summary judgment on all claims asserted by the Plaintiff. Having now received the parties' briefs and designated evidentiary materials, the matter is ripe for the Court's consideration.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is the moment in litigation where the non-moving party is required to marshal and present the court with evidence on which a reasonable jury could rely to find in his favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court should only deny a motion for summary judgment when the non-moving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*,

652 F.3d 726, 731 (7th Cir. 2011) (citing *United States v. 5443 Suffield Terrace*, 607 F.3d 504, 510 (7th Cir. 2010); *Swearnigen–El v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 859 (7th Cir. 2010)). The court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Material facts are those that are outcome determinative under the applicable law. *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). "Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008).

## STATEMENT OF FACTS

The Plaintiff is a current employee of General Motors, LLC. She began working in a salaried position for the former General Motors Corporation at its Baltimore, Maryland, assembly plant in 1983, and has worked in a variety of positions throughout her tenure with GM.[1] The Plaintiff received a bachelor's degree in mechanical engineering in 1998 and a master's degree in business in 2006, while working for GM.

Under GM's pay grade system, salaried employees are assigned to a level ranging from level 4 through level 9. This salary system contains descriptions of the degree of work responsibilities that are commensurate with each of the levels, which are established by GM's

---

[1] Although General Motors LLC and the former General Motors Corporation are separate and distinct legal entities, the Court will use GM to refer to either entity throughout this Opinion and Order.

corporate offices. Positions with more responsibilities are designated by higher levels. GM's corporate offices also establish the salary range that is attached to each level. The Plaintiff received numerous promotions that elevated her from a level 4 to a level 8 in GM's compensation structure. In 2004, the Plaintiff was working as a paint production superintendent and was classified as a level 8 salaried employee when she transferred to GM's Fort Wayne, Indiana, assembly plant because the Baltimore plant was closing.

GM's corporate office provides oversight and guidance to the plants on staffing and the classification of salaried positions. However, local plant leadership has some autonomy and discretion in setting the scope of work and responsibilities for jobs based on the unique needs and operations of a plant. A plant human resources management (HRM) committee makes personnel decisions regarding salaried employees at the Fort Wayne plant. From about 2009 through 2012, the following members of management within the Fort Wayne facility were on the HRM committee: Mike Glinski, Plant Manager; Betty Romsek/Nick Kassanos, Assistant Plant Manager; Mary Tonne, Controller; Ann Playter/Steve Andreen, Engineering Director; Rick Baker/Rick Hinzpeter, Quality Director; Ann Scheider, Material Director; Steve Shreffler, Body Area Manager; Steve Danielson/Bill Muzzillo, Paint Area Manager; Scott Landstra, General Assembly Area Manager; and Jeff Sorensen, Personnel Director. The Lead Salary HR Representative, Greg Brown, coordinated and facilitated the HRM committee meetings, but was not a voting member of the HRM committee.

In February 2009, the HRM committee decided to transfer the Plaintiff to the engineering manager position, which was open because the former engineering manager, Asifhusen Khatri, had been reassigned to production. The Plaintiff came into the position as a level 8A employee

and her salary was $115,452. In 2009, the salary range for level 8 was between $69,000 and $145,800. Khatri's salary in the engineering manager position had been $116,952.

GM underwent a massive company-wide restructuring in 2008 and 2009 as a result of the conditions that eventually forced it into bankruptcy. As part of the restructuring, and in an attempt to create a leaner organization, GM corporate directed Fort Wayne management to reduce the number of its level 8 positions. As a result, in May 2009, the Plaintiff's engineering manager position was leveled down from an 8 to a 7. The Plaintiff continued to perform the same work and receive the same base salary. But by January 2010, her salary was capped at $118,440.

The Plaintiff had ongoing discussions with Ann Playter, the Engineering Director at the Fort Wayne plant, about getting her position reinstated to a level 8, and Playter was supportive. In May 2011, GM's corporate HR asked Fort Wayne management to survey the plant's salaried positions affected by the bankruptcy restructuring to determine whether it was appropriate to restore those positions to their former levels. The HRM committee collectively believed the engineering manager position should be restored to a level 8. However, this change did not occur until over a year later, in September 2012. During this time, the plant leadership engaged in discussions about changing engineering from a centralized structure to a decentralized structure.[2] If the plant moved to a decentralized structure, it was unlikely the engineering manager position would be reinstated back to a level 8. Management ultimately decided to maintain a centralized engineering structure, but did not decide this until late 2011. In 2011 was also when the Engineering Director, Steve Andreen, began addressing performance issues with the engineering

---

[2] The engineering manager position has more direct reports in a centralized structure. Conversely, in a plant with a decentralized structure, the engineering manager has less responsibilities. One of the other plants, Arlington, had a decentralized structure.

department, particularly its responsiveness to production needs when breakdowns occurred. The responsibility of the engineering department is to service production by troubleshooting breakdowns, making continuous improvements, and installing new equipment. The Fort Wayne plant was preparing to launch two new product lines that required a substantial installation of new equipment. However, the plant was also experiencing a high level of equipment failure because routine maintenance had previously been put off for lack of funds. This created a tension between the amount of time required to meet deadlines for project work, and time spent on maintenance work for existing production. However, according to the Plaintiff, her performance review meeting at the end of 2011 was the first time she was instructed to shift the engineering department's focus from project work to production floor response and maintenance.

The Plaintiff filed a Charge of Discrimination with the EEOC on August 6, 2012, complaining of discrimination in her rate of pay. The next day, she visited Brown in the personnel department to advise him that she filed a discrimination claim with the EEOC due to GM's failure to re-level her position back to a level 8. Brown advised only his supervisor, Personnel Director Jeff Sorenson, of the Plaintiff's Charge. Brown did not inform anyone else of the Charge until after he received a formal notice from the EEOC on August 31, 2012, and there was never any discussion in HRM Committee meetings about the Charge.

On August 31, 2012, the Plaintiff met with the Assistant Plant Manager, Nick Kassanos, and the Material Director, Ann Schneider. They notified the Plaintiff that she was being promoted and the engineering manager position was being reclassified to a level 8 effective September 1, 2012. They also advised her that on November 1, 2012, she would be transferring to a level 8 material shift leader position. Her reassignment was part of a series of moves at the

superintendent level made by the HRM committee in an effort to cross-train, align skills sets, and raise the level of expertise in various areas of the plant. It was not unusual within GM's structure to transfer or reassign salaried employees without seeking their input or providing them with options. The Plaintiff was informed she would initially be assigned to third shift, but that the Plaintiff and the other material shift leaders would eventually rotate shifts. During the meeting, the Plaintiff expressed her disappointment at the material shift leader assignment. She thought there would be less opportunity for overtime, wanted to remain in a technical engineering role, and opposed working third shift. Schneider explained that the Plaintiff's engineering background would be helpful to the material department, and that Schneider herself, as well as at least one other employee in the department, had engineering backgrounds similar to the Plaintiff's. The Plaintiff asked if she could remain in the engineering manager position or apply for a maintenance superintendent position if one became available as a result of the other lateral moves. Kassanos and Shneider advised the Plaintiff that the staffing decisions, which had been made to develop each individual's strengths and skill sets and to improve plant operations, were final, and management needed to stabilize the organization through the launch of new products.

The Plaintiff has continued to work in the material shift leader position at a level 8 pay grade since November 1, 2012. She has worked overtime since transferring to the material shift leader position, and she earns a shift premium of 10% of her base salary for working third shift.

Upon the Plaintiff's reassignment, a job posting for her former engineering manager position was posted internally. Brett Stillwell, who had been working as a level 8 general assembly maintenance superintendent at Fort Wayne, applied and was selected for the position.

6

He retained his level 8 classification upon his transfer to engineering.

# ANALYSIS

**A.    Equal Pay Act**

The EPA prohibits employers from paying employees different wages based on gender. *See* 29 U.S.C. § 206(d); *Warren v. Solo Cup Co.*, 516 F.3d 627, 629 (7th Cir. 2008). A prima facie case of wage discrimination is established if a preponderance of the evidence shows that the defendant (1) paid higher wages to a male employee, (2) for equal work requiring substantially similar skill, effort and responsibilities, and (3) the work was performed under similar working conditions. *Warren*, 516 F.3d at 629. A prima facie case does not require proof of discriminatory intent. *Id.* If the plaintiff establishes a prima facie case, the burden shifts to the defendant to offer a gender neutral justification for the wage differential. *Id.* The statutory defenses are bona fide differences bases on a seniority system, a merit system, a system that measures earnings by quantity or quality of production, or a differential based on any other fact other than sex. 29 U.S.C. § 206(d).

Before the Court can discuss the elements of a prima facie case, it must determine what the Plaintiff is claiming as an EPA violation. The Plaintiff alleges in her Amended Complaint that from April 2009 until September 2012, the Defendant paid male employees higher wages for jobs that required equal work, skill, effort and responsibility, and that the unlawful conduct was willful. In the Plaintiff's Brief in Response to Defendant's Motion for Summary Judgment, the Plaintiff asserts that "she is not challenging her initial demotion under the EPA—such a claim would fall outside of the statute of limitations." (ECF No. 39 at 11.) An Equal Pay Act suit must

be commenced within two years after the cause of action accrued, or within three years after the cause of action accrued if the alleged violation was willful. 29 U.S.C. § 255(a). The Plaintiff filed her Complaint on November 13, 2012. Thus, she may lodge an EPA challenge to any pay periods going back to November 13, 2009.

The Plaintiff also clarifies in her Response Brief that she is comparing her position and pay to the following male employees: (1) her predecessor, Asifhusen Khatri; (2) her successor, Brett Stillwell; and (3) the engineering managers at GM's other North American assembly plants.

1.      *Higher Wages to a Male Employee*

When the Plaintiff became the engineering manager at the Fort Wayne facility, her salary was less than what her male predecessor had been earning. Additionally, the Plaintiff has identified several male engineering managers at other assembly plants that earned higher salaries during the relevant period.

With respect to Stillwell, the Defendant notes that the Plaintiff's salary was already increased to $124,368 by the time Stillwell assumed the position. While this may rule out any claim of disparate pay after September 2012—a claim the Plaintiff does not actually advance—it does not render the evidence less germane to her claim that she was disparately paid during the three years' prior to being restored to a level 8, when her salary was capped at $118,440. *See Patkus v. Sangamon-Cass Consortium*, 769 F.2d 1251, 1260 (7th Cir. 1985) ("The salary paid to a successor who performs substantially the same work may provide a basis for an equal pay action."). Further, within 5 months, Stillwell's salary was increased from $121,860 to $132,828.

The Plaintiff has identified male employees who were paid more than she and thus met the first part of the prima facie test.

**2.      *Equal Work***

In determining whether two jobs are equal, the Court must "look to the duties actually performed by each employee, and not to his or her job description or title." *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1461 (7th Cir. 1994) (citing *Soto v. Adams Elevator Equip. Co.*, 941 F.2d 543, 548 (7th Cir. 1991)). Those duties, however, need not be identical; the crucial inquiry is "whether the jobs to be compared have a 'common core' of tasks, i.e., whether a significant portion of the two jobs is identical." *Fallon v. Illinois*, 882 F.2d 1206, 1209 (7th Cir. 1989) (citations omitted). Once the plaintiff establishes a common core, the court must ask whether any additional tasks make the jobs "substantially different." *Id.* (citation and quotation marks omitted); *see also Cullen v. Ind. Univ. Bd. of Trustees*, 338 F.3d 693, 698 (7th Cir. 2003).

The EPA specifies three separate elements that are to be considered in comparing job duties: skill, effort, and responsibility. *See* 29 U.S.C. § 206(d)(1). Each of these elements must be met individually to establish a prima facie case, *see* 29 C.F.R. § 1620.14, but the appropriate comparison is between the jobs at issue, not the individuals holding those jobs, *Cullen*, 338 F.3d at 699 (citing 29 C.F.R. § 1620.15(a)). *See also Covington v. S. Ill. Univ.*, 816 F.2d 317, 323 n.9 (7th Cir. 1987) ("It seems clear from the legislative history of the Equal Pay Act that factors such as experience and education operate as a defense rather than as part of the plaintiff's prima facie case.").

None of the evidence before this Court suggests that the experience, training, education,

or ability required to perform the engineering manager job changed when Khatri was transferred out of the position and the Plaintiff was transferred in. *See* 29 C.F.R. § 1620.15(a) (identifying skill to include "consideration of such factors as experience, training, education, and ability"). Neither does any designated evidence suggest there was a change in the effort needed to accomplish the job or the responsibilities it entailed. *Cf. Howard v. Lear Corp. EEDS & Interiors*, 234 F.3d 1002, 1005 (7th Cir. 2000) ("The additional skill, effort, and headache involved in managing three to six times the number of workers in a more complex employment environment rendered the [ ] positions . . . substantially different."). According to the Plaintiff, Khatri cross-trained her to perform the job and she assumed all of his duties.

The Defendant does not present any argument regarding the engineering position at the Fort Wayne assembly plant in 2009, and thus does not dispute that the work involved was the same before and after the Plaintiff filled the position. The same is true for the engineering position when the Plaintiff's successor took over. The Defendant's focus in defense of the EPA claim is on the Plaintiff's attempt to compare her position with the engineering managers in GM's other assembly plants. The Plaintiff has cited to a common core of tasks that would require similar skill, effort, and responsibility. But the Defendant argues that the Plaintiff's statement that all engineering managers supervised other engineers, managed project work, planned production methods, and oversaw installation and repair of equipment is a "conclusory description [that] glosses over significant differences among the engineering manager positions across GM's assembly organization." (Def.'s Reply 2, ECF No. 47.) This argument has no teeth, as the Defendant fails to describe any of these "significant differences" or establish that the differences favor its position instead of the Plaintiff's. For example, the Defendant notes that the

skill and responsibilities required for oversight of projects or equipment would have differed between Fort Wayne and other plants because they produced different vehicles. But the Defendant does not suggest that the oversight for the other vehicles required more skill, additional responsibilities, or an increased degree of effort. *See* 29 C.F.R. § 1620.15(a) ("If an employee must have essentially the same skill in order to perform either of two jobs, the jobs will qualify under the EPA as jobs the performance of which requires equal skill, even though the employee in one of the jobs may not exercise the required skill as frequently or during as much of his or her working time as the employee in the other job."); 29 C.F.R. § 1620.16(a) ("Where jobs are otherwise equal under the EPA, and there is no substantial difference in the amount or degree of effort which must be expended in performing the jobs under comparison, the jobs may require equal effort in their performance even though the effort may be exerted in different ways on the two jobs."); 29 C.F.R. § 1620.17(a) ("Responsibility is concerned with the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation.").

The Defendant also complains that the Plaintiff has not presented any evidence to compare the number and type of engineers that reported to each engineering manager. But the Defendant does not propose that the engineering managers in any of the other plants had more employees directly reporting to them, or had more accountability based on those direct reports.

On the other side, the Plaintiff has presented evidence that, between 2009 and 2012, her position required a significant increase in engineering project work related to new equipment that needed to be installed for assembly of heavy duty models that had previously been produced in a different plant. The equipment for the new model was installed in the fall of 2009 and

production of the heavy duty truck models began in January 2010. Also in 2010, GM authorized the Fort Wayne Assembly Plant to increase production from two shift to three shift. The number of people directly reporting to the engineering manager position increased. The period between 2009 and 2012 also saw the launch of two new product lines. A majority of the engineering department's work for the launch was completed before the Plaintiff moved out of the engineering department in November 2012. In addition, the plant was experiencing a high level of equipment failure caused by lack of routine maintenance being withheld for insufficient funding.

Still attacking the Plaintiff's comparison of core duties, the Defendant argues that the Plaintiff cannot rely on meetings she occasionally participated in or discussions she had with other engineering managers to testify to the "specific skill, effort and responsibility attributed" to other engineering manager's jobs. The Defendant also describes the Plaintiff's statements that her responsibilities were greater than engineering managers in other plants as "conclusory" because it is based on "limited information she accessed through a GM database" which "does not accurately capture all responsibilities and skills required of each engineering manager job." (Def.'s Reply 3.) First, these arguments do not speak to the Plaintiff's evidence concerning the increase in her own job duties from 2009 to 2012 based on circumstances within the Fort Wayne Assembly Plant—conditions that were verified by the Engineering Directors. Second, the conversations and databases provided a basis for the Plaintiff's personal knowledge and inferences, which she specifically detailed in an affidavit, and the Defendant does not present contradictory proof. Besides, the Plaintiff need not describe every responsibility and skill of each manager; her assessment of the core duties is sufficient to create a triable issue of fact regarding

the equality of the engineering manager positions. It is not true, as the Defendant argues, that the Plaintiff's admission that day-to-day responsibilities differed at each plant is the death knell of her comparison. (Def.'s Reply 2 (arguing that the Plaintiff's admission is "fatal to her claim")).

This becomes even more evident when the Plaintiff "admission" is viewed within the context of the deposition testimony from where it is taken:

Q.    [H]ow do you know what the duties and responsibilities are of all the engineering managers of other plants? I mean, what are you basing that on?

A.    I know that the core responsibilities of the engineering manager come from corporate and go to the plants, and then whether it is centralized or an area manager setup, they have certain responsibilities.
      I know because I see their names in the ACAP system, so I know they were responsible for ACAP. I see them submitting through the Global Project Registration. I see their name on some of the financial forecasting spreadsheets that I was responsible for. So I have a somewhat good idea.
      I have spoken with some of them on occasion when we have a problem in our plant and they had similar equipment. So I have spoken to the engineering manager at Lordstown, at Bowling Green, at Spring Hill, at Hamtramck, so I know from that.
      Based on a work chart, I can see how many people work for them. That gives me a pretty good idea of what their profile is, you know, as far as how their organization is set up. I know their number of shifts. I know the product that they are building.

Q.    And, I'm sorry, but where are you getting this information?

A.    Organizational chart for the direct reports. The product is, you know, out there, what they are building. The number of shifts, that is information that we have that we use especially when we were getting ready to go from two shifts to three shifts, we were talking to other plants that were currently running three shifts, and when other plants went from two shifts to three shifts, they were calling us, so you are pretty aware of what the other plants are running, how many shifts.
      I can see in the Global Project Registration which is a listing of all of the project money that different plants have requested. I can see not only my plant, but I can see all of the other plants and I can see what type of project work they have out there.

> Those are just some of the examples of how I know what they are involved in and what their responsibilities are.

Q.      But as far as like day-to-day duties and responsibilities. I mean, it could be different depending on the line of business, on the product for similar positions at different plant; right? I mean the day-to-day responsibilities.

A.      Yes.

(Pl.'s Dep. 80–82, ECF No. 34-1.) "Differences in responsibility must be substantial; to argue that *any* difference in supervisory responsibility renders jobs unequal is manifestly incorrect as a matter of law." *Fallon*, 882 F.2d 1206, 1209 (7th Cir. 1989) (quotation marks omitted); *see also* 29 C.F.R. § 1620.17 ("Responsibility is concerned with the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation."). The Defendant has not identified any differences in the engineering manager responsibilities, much less presented argument that these differences were sufficiently substantial to render the jobs unequal.

Based on the foregoing, a jury could conclude that the engineering managers positions across GM involved a common core of tasks or that a significant portion of the jobs were identical. The Defendant's evidence does not establish, as a matter of law, that the engineering manager jobs performed by the Plaintiff's predecessor, her successor, or the engineering managers in the other assembly plants involved any additional tasks that made the jobs substantially different.

3.      ***Similar Working Conditions***

There is no suggestion in the record that the engineering manager jobs, performed either within the same facility or within other GM assembly plants in North America, were performed

under different working conditions.

4.      *Affirmative Defense: Factors Other Than Sex*

Once a plaintiff satisfies his or her prima facie case, the employer bears the burden of showing that the pay disparity is due to: (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality or production; or (iv) a differential based on any other factor other than sex. 29 U.S.C. § 206(d)(1). These are affirmative defenses on which the employer bears the burden of persuasion. *Corning Glass Works v. Brennan*, 417 U.S. 188, 196–197 (1974); *Dey*, 28 F.3d at 1462; *Fallon*, 882 F.2d at 1211.

The Defendant relies on the last category, a differential other than sex, to explain the pay disparity. First, the Defendant cites to financial constraints and restructuring on the verge of its bankruptcy to explain the move from level 8 to 7. The Defendant argues that "[a]s conditions stabilized, management considered reinstating the position to level eight, but initially chose not to because of ongoing discussions about restructuring the engineering organization." (Def.'s Br. 18, ECF No. 34.) The Defendant then notes that complaints lodged by production managers about the engineering department's response time "raised concerns that plaintiff was not suited for that position at [a] higher level." (*Id.*)

Although the Defendant has submitted that Fort Wayne management was considering reorganizing the engineering department to a decentralized structure, it has not explained why the position was not releveled to the appropriate level for the status quo—that is, for a centralized structure. It is undisputed that the HR committee regarded the level of work performed in the engineering manager position worthy of a level 8 designation. Because there is

evidence that the duties being undertaken supported a higher salary, a jury should decide whether the Defendant's failure to reinstate the position while management discussed a potential structural change was a gender neutral reason for the delay. The Court does not make this determination as a matter of law. The Defendant also maintains that there was not a consensus on how to staff the position because area managers and assistant plant managers who oversaw production did not believe that the engineering department was being responsive to production needs, particularly with respect to breakdowns and issues with new equipment. But the Plaintiff submits that she was not informed of problems with her performance until the end of 2011, and there is no evidence that anyone was seeking to remove the Plaintiff from the engineering manager position during this time based on her performance. The Defendant kept the Plaintiff in the engineering manager position for nearly three years after it was reduced to a level 7. By all accounts, the engineering department was under an extreme amount of stress during this time, and the work load actually increased. Again, it would not be appropriate for the Court to ponder the nuances and inconsistencies; a jury is entitled to weigh the facts to determine whether the Defendant's delay in paying the Plaintiff commensurate with the pay received by others who performed the same level of work was based on her performance. The Court cannot make the determination, as a matter of law, that these were gender neutral reasons for the Defendant's delay in releveling the engineering manager position.

With regard to Stillwell, the Plaintiff's successor in the engineering manager position, the Defendant argues that his pay differential was justified by the fact that he had a technical maintenance background with GM, which the Plaintiff did not have. (Def's Reply 7.) The Plaintiff, however, has presented evidence that she also had a technical maintenance background

with GM, having worked for ten years at GM's Baltimore Assembly plant on the maintenance side and five years as a maintenance supervisor. Even without this evidence, maintenance experience was just one of the criteria that Andreen stated was necessary for filling the position, with the others being an engineering degree or equivalent, and project management experience. There is no testimony in the record that a technical maintenance background was more important that any of the other factors, or that the Plaintiff did not meet the criteria for holding the position.

Because the review of factors impacting pay is highly fact-specific and the calculus of factors will differ as to each employee and position, the Court cannot say as a matter of law that sex played no role. Accordingly, the Defendant's Motion for Summary Judgment is denied as to Plaintiff's Equal Pay Act claim.

**B.      Title VII**

The Plaintiff alleges in her Amended Complaint that the Defendant discriminated against her on the basis of her sex by "paying its male engineering managers more than Plaintiff and by classifying Plaintiff's job at a lower level than her male counterparts." (Am. Compl. ¶ 31, ECF No. 18.) She argues that, under the direct method of proof, she has presented sufficient circumstantial evidence of discrimination from which a jury could decide in her favor. According to the Plaintiff, this evidence includes the fact that when the plant manager decided to move her from a level 8 to level 7, he acted outside the recommendation of the HRM committee and kept a male employee at a level 8 instead. The Plaintiff also disputes that her job performance was a factor in the Defendant's decision to keep her at a level 7 after financial restrictions no longer required it.

The Plaintiff acknowledges that corporate GM directed the Fort Wayne facility to reduce its level 8 positions to level 7 for financial reasons, but proposes that the decision to relevel her position instead of another position held by a male was suspect. To support her claim of suspicious circumstances, the Plaintiff asserts that the plant manager, Mike Glinski, independently made the decision to reduce her position despite the HRM committee's consensus to reduce the second shift lead superintendent to level 7 and keep the engineering manager position at a level 8. The Defendant disputes the Plaintiff's characterization.

Ann Playter, the Engineering Director, was involved in the discussion regarding which positions to reduce from level 8 to level 7. She testified that when the HR committee had to choose between the second shift lead superintendent and the engineering manager there was a consensus to keep the engineering manager at a level 8. However, this was with the understanding that Glinski was going to make a pitch for corporate to allow the Fort Wayne facility to get an extra level 8 manager that other plants were not allowed based on its production volume and hours. This would permit Fort Wayne to then keep the lead superintendent, which was a position unique to the Fort Wayne facility, as well as maintain the engineering manager position at a level 8. When corporate did not accept Glinski's argument about an extra level 8, he had to decide which position was more important to the facility. Glinski made the decision to relevel the engineering manager and keep the second shift lead superintendent, which he believed was a critical position because of the rate and volume of Fort Wayne's production. According to Playter, the second shift lead superintendent managed other level 8 employees, so it had to be maintained at a level 8. Accordingly, if Fort Wayne was going to keep the position, the reduction had to impact another position. The engineering manager was the last management

position discussed as an option, so Glinski made the final decision to reduce it to a level 7 and meet corporate's quota.

With this legitimate business explanation, and no evidence to dispute that it was the real reason for the decision, no reasonable jury could find that gender was a motivating factor in choosing to keep the second shift lead superintendent position and reduce the Plaintiff's position from level 8 to level 7. However, a jury could consider whether the Plaintiff's gender was a factor in keeping her at level 7 throughout her tenure in the position, even after the quota on level 8 positions was lifted.

The Plaintiff presents evidence that her work load increased from 2009 through 2011, and that the topic of bringing her position back to level 8 was raised by 2010, when the Defendant began hiring additional level 8 employees. According to the Defendant, the Plaintiff was not restored to level 8 at this time because Fort Wayne management was having ongoing discussions about reorganizing the engineering department to a decentralized structure. Although the decision was eventually made to keep the centralized structure, a jury could question the Defendant's reasons for keeping the Plaintiff at a lower pay throughout the discussions, as it is undisputed that the level of work under the existing format supported a higher salary. The Defendant also maintains that there was not a consensus on how to staff the position because of the engineering department's response breakdowns in production. On the other hand, the Plaintiff was not informed of problems with her performance until the end of 2011, and she continued to hold the position until late 2012. The engineering manager position required attention to project work for new equipment, and responsiveness to production. The Defendant does not suggest that balancing these two aspect of the job was not difficult, or unworthy of level

8 pay, especially during the time frame the Plaintiff held the position. In fact, as mentioned above, it acknowledges that the position was worthy of the level 8 designation. A jury should be allowed to consider GM's delay within the context of the entire record, including that fact that the engineering managers for GM's other production facilities, staffed by men, were designated as level 8. *See Ripberger v. Corizon, Inc.*, 773 F.3d 871, 877 (7th Cir. 2014) (Evidence that others outside the protected class were systematically treated better can create an inference of discriminatory intent.).

A myriad of factors appears to have weighed into the timing of the decision to relevel the position. The Plaintiff has presented evidence to permit a jury to consider the facts and testimony and deliberate whether one of the factors for the seeming lack of urgency was the Plaintiff's gender. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2526 (2013) (explaining that, under Title VII and its amendments, a plaintiff can obtain declaratory relief, attorney's fees and costs, and some forms of injunctive relief based solely on proof that race, color, religion, sex, or nationality was a motivating factor in the employment action even if other factors also motivated the decision, but an employer's proof that it would still have taken the same employment action would save it from monetary damages and a reinstatement order). Because the evidence viewed in a light most favorable to the Plaintiff could lead a reasonable jury to return a verdict in her favor, the Defendant's request for summary judgment must be denied.

## C. Retaliation Claim

The Plaintiff filed her EEOC Charge complaining of pay discrimination on August 6, 2012. She was moved to the material shift leader position on November 1, 2012. The Plaintiff

claims that the Defendant's decision to move her from the engineering manager position to the material shift leader position was retaliation for her complaints of discriminatory pay. This job change will only support a retaliation claim if it was a materially adverse action. *See Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1106 (7th Cir. 2012) (direct method); *Harper v. C.R. England, Inc.*, 687 F.3d 297, 309 (7th Cir. 2012) (indirect, burden-shifting approach). An action is materially adverse for purposes of retaliation if it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotation marks omitted). "[N]ot everything that makes an employee unhappy is an actionable adverse action." *Stutler v. Ill. Dep't of Corrs.*, 263 F.3d 698, 703 (7th Cir. 2001) (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996)).

The Plaintiff's general assertions about overtime and the relative prestige of the two positions do not convince the Court that her transfer to the material shift leader position was materially adverse. The Plaintiff has received overtime pay in her new position, and has not otherwise established that the transfer negatively impacted her wages, benefits, or career prospects. The perception of less prestige is, on the current record, the Plaintiff's alone. There is no evidence that the job actually entails "objectively less desirable duties." *Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 729–30 (7th Cir. 2009) (stating that the plaintiff's subjective belief that one job was "more prestigious" than another was "her personal preference [that was] not sufficient to establish an adverse action"). Accordingly, from an objective standpoint, the Plaintiff's transfer to a different department would not dissuade a reasonable professional working at GM from bringing a charge of discrimination.

In addition to failing to show that she suffered materially adverse actions, the Plaintiff has not put forth evidence from which a reasonable jury could find that the Defendant's employment decisions were made out of a desire to retaliate against the Plaintiff for filing the EEOC Charge. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2417, 2528 (2013) ("Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action."). A plaintiff may supply the necessary causal link through circumstantial evidence from which a jury may infer intentional discrimination. *Stephens v. Erickson*, 569 F.3d 779, 787 (7th Cir. 2009). Such circumstantial evidence may include suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual. *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012). When the plaintiff has "assemble[d] from various scraps of circumstantial evidence enough to allow the trier of fact to conclude that it is more likely than not that discrimination lay behind the adverse action, then summary judgment for the defendant is not appropriate." *Morgan v. SVT, LLC*, 724 F.3d 990, 996 (7th Cir. 2013).

A close temporal connection between the protected act and the adverse employment action, without more, is insufficient to support an inference of causation. *Turner v. The Saloon, Inc.*, 595 F.3d 679, 687 (7th Cir. 2010). Here, while there was a close temporal connection, the Plaintiff has not established that the individuals who made the employment decision were aware of the Plaintiff's protected activity. But even if they were aware, the Defendant has identified a legitimate business reason for the employment changes within the Fort Wayne plant. The Plaintiff has not identified any weaknesses or implausibilities in the Defendant's reason that

would suggest it is not believable. *See Coleman*, 667 F.3d at 852–53 (citations omitted) (noting that pretext can be shown by "identif[ying] . . . weaknesses, implausibilities, inconsistencies, or contradictions" in an employer's asserted reason for taking an adverse employment action such "that a reasonable person could find [it] unworthy of credence"). For example, she claims that the Defendant did not follow normal practices when deciding to move her because Kassanos did not talk to Andreen, the Plaintiff's immediate supervisor. However, her designated evidence does not establish a "normal practice." And while she challenges whether Kassanos had enough knowledge of her job duties to make an informed decision about the move, Schneider, the Material Director, specifically told the Plaintiff that her engineering background would be useful in her new position. In any event, pretext is "a deliberate falsehood" not "[a]n honest mistake, however dumb." *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 419 (7th Cir. 2006). Therefore, the Court is not concerned with whether Kassanos made the right decision, but whether the Plaintiff has presented evidence from which a factfinder could make the reasonable inference that the Defendant made a retaliatory decision. She has not done this.

The Plaintiff thinks it suspicious that GM moved so many other employees at the same time. But again, she does not present any evidence to suggest that this particular practice was unusual—or how moving other people in addition to the Plaintiff even logically supports an inference that the Defendant was out to get the Plaintiff for her protected activity. The record before the Court is that the Plaintiff's reassignment was part of a series of moves at the superintendent level made for purposes of crosstraining, and that it was not unusual within GM's structure to transfer or reassign salaried employees without seeking their input or providing them with options. Given this evidence, it is hard to see how a rational jury could consider the

circumstances surrounding the decision to be evidence of a retaliatory animus. Finally, the Plaintiff notes that there is discrepancy in the record regarding whose idea it was to move the Plaintiff, but has not explained how this discrepancy supports an inference of retaliation.

## CONCLUSION

For the reasons stated above, the Defendant's Motion for Summary Judgment [ECF No. 33] is GRANTED IN PART and DENIED IN PART; the Plaintiff's Motion for Oral Argument [ECF No. 42] is DENIED; and the Plaintiff's Request to File a Sur-Reply Opposing Defendant's Motion for Summary Judgment [ECF No. 49]  is GRANTED, the Court having already considered the entirety of the parties' arguments.

SO ORDERED on February 10, 2015.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT